# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

MARC DEJEAN,

                                Plaintiff,

      vs.                                9:14-CV-445
                                         (BKS/ATB)

MALCOLM ROTH M.D., et al.,

                               Defendants.

MARC DEJEAN, Plaintiff pro se
MARIA LISI-MURRAY, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this amended civil rights complaint, plaintiff alleges that he was denied constitutionally adequate medical care in violation of the Eighth Amendment. (Amended Complaint ("AC")) (Dkt. No. 51). Although plaintiff's amended complaint does not contain a section for "Relief" requested, his original complaint sought substantial monetary relief.[1]

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 94). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt. Nos. 104, 106). For the following reasons, this court agrees with defendants and will recommend granting the motion and

---

[1] Because plaintiff has now been released from incarceration, damages are the only relief to which plaintiff would be entitled.

dismissing the amended complaint in its entirety.

I.    <u>Facts</u>

A.    **Plaintiff's Amended Complaint**

In his amended complaint, plaintiff alleges that at some unspecified time in January of 2013, he suffered an injury to his left pinky finger "in the North Gym of the Green Correctional Facility ("Greene . . . .") and "immediately submitted a request to be seen by the medical department of the facility." (AC ¶ 10). Plaintiff claims that he was not "called out" to the medical department until February 11, 2013, "despite several written requests . . . ." (*Id*.) Plaintiff then states that, when he was finally examined, the "medical department" never advised him to "refrain from any type of strenuous activity so on April 24, 2013, [he] competed in a facility sponsored power lifting sport competition." (AC ¶ 11). Plaintiff claims that, during the competition, he felt a sharp pain radiating from his left pinky, which caused him to "release the weight of approximately seven hundred pounds on the same injured digit and fracture it." (*Id*.)

Plaintiff states that he was immediately brought to the Albany Medical Center ("AMC"), where his finger was "sutured," and a splint was applied to prevent plaintiff from moving the finger. (AC ¶ 12). Plaintiff states that, "according to the Correction Officer" who transported him to AMC and observed the surgery, defendants Malcolm Roth and Mark Daniels performed the surgery and inserted two metal pins in his left pinky finger. (AC ¶ 13). Plaintiff claims that he was discharged after surgery "with the explicit instruction that [he] must return in no less than three (3) weeks" to have Dr. Roth remove the pins because "they should not remain inside my hand for more than

three weeks." (*Id.*)

Plaintiff claims that he was not returned to AMC in three weeks, and plaintiff was never informed why his procedure had been cancelled or delayed. (AC ¶ 14). Plaintiff claims that during an eleven week delay in removing his pins, he was "subjected to excruciating pain on a daily basis" by defendant Nelson Abenes,[2] a physical therapist ("PT"). (AC ¶¶ 15-16). Plaintiff claims that, "during the period from April 30, 2013 to June 19, 2013,"[3] PT Abenes caused him to experience "extreme pain" in his left pinky finger because PT Abenes instructed plaintiff to perform "physical therapy" exercises, when defendant Roth had recommended "occupational therapy." (*Id.*)

Plaintiff claims that defendant Roth "disregarded his responsibility" when he did not make certain that someone would be "available" to remove plaintiff's pins after three weeks. (AC ¶ 17). Plaintiff claims that defendant Daniels "disregarded his responsibility" when he learned that defendant Roth was going to be on vacation "and failed to ensure" that the pins were removed at the appropriate time. (AC ¶ 18). Plaintiff claims that defendants Roth and Daniels were "deliberately indifferent" to plaintiff's "follow-up care." (AC ¶ 19).

Plaintiff also alleges that the physicians at Greene, Dr. Jon Miller and Dr. Mary Smith were deliberately indifferent to plaintiff's "follow-up" care by failing to ensure

---

[2] Plaintiff incorrectly refers to this defendant as Abenes Nelson. (AC at p.1). His name is Nelson Abenes, and the court will refer to this defendant using his proper name.

[3] The court must note that this period is **not** eleven weeks.

that plaintiff's pins were removed within the required three week period. (AC ¶ 21).

Plaintiff alleges that in July and August of 2013, plaintiff became concerned about his "extreme pain" and the lack of mobility in his finger, and he requested copies of his medical records, but he was denied by the "medical department." (AC ¶ 22). Plaintiff then states that his request for records was "in response" to defendant PT Abenes June 14, 2013 decision that the paraffin wax bath and therapeutic exercises, "ordered by defendant Roth" were not sufficient because "plaintiff's injuries were severe and required more aggressive occupational therapy." (AC ¶ 23). Plaintiff claims that Dr. Smith and Dr. Miller "deviated from normal standards" when they did not properly follow Dr. Roth's order for occupational therapy and "thereafter ignored plaintiff's complaints about the extreme pain and lack of range of movement of the digit." (AC ¶ 24).

Plaintiff states that, on August 8, 2013, even though there was no "new injury" to plaintiff's finger, defendant Smith informed plaintiff that he would have to undergo a second surgical procedure, which was scheduled for October 22, 2013. (AC ¶ 25). Plaintiff states that he was "misled" to believe that the surgery scheduled for October 22, 2013 was related to the initial injury in January of 2013 and the April 24, 2013 fracture. (AC ¶ 26). Plaintiff states that the October 22, 2013 surgery was performed by Dr. Roth, "assisted by an unknown physician," and consisted of raising the "collateral ligament" in plaintiff's pinky finger. (AC ¶ 27). Plaintiff claims that the "assisting physician" recommended that occupational therapy begin within forty-eight (48) hours after surgery to prevent "adhesion and post-operative complications." (*Id.*) Plaintiff

claims that defendants Smith and Miller reviewed the medical records after the surgery, but still refused to follow Dr. Roth's recommendations. (AC ¶ 28).

After the October 22, 2013 surgery, plaintiff alleges that defendants Smith and Miller ordered plaintiff to be in "full medical restriction," which required that meals be delivered to plaintiff in his cell. However, defendants never followed-up on their order, and meals were not delivered to plaintiff. (AC ¶ 29). Plaintiff alleges that on November 8, 2013, defendant Roth ordered that plaintiff be removed from full restriction because such limitations would impede plaintiff's rehabilitation. (AC ¶ 30). Defendant Smith did not comply with Dr. Roth's order until November 19, 2013. (AC ¶ 31).

Plaintiff claims that defendants Smith and Miller terminated plaintiff's occupational therapy without consulting Dr. Roth. (AC ¶ 32). As a result, plaintiff's suffered swelling and pain in the post-operative site. (AC ¶ 33). On December 6, 2013, Dr. Roth's "assistant" noted swelling of the site, continued the order for occupational therapy, and "noted" that the order for a nighttime splint was not followed. (AC ¶ 34). Plaintiff claims that defendants Smith and Miller "repeatedly" cancelled appointments or "mixed up" his appointments, which resulted in one instance in which plaintiff was sent to the wrong medical facility for the long-delayed occupational therapy evaluation. (AC ¶ 35).

During a January 10, 2014 consultation, the occupational therapist noted plaintiff's inability to perform certain functions and recommended additional occupational therapy, together with a nighttime splint. (AC ¶ 36). Plaintiff states that on January 30, 2014, Dr. Roth refused to recommend further occupational therapy and

instead, instructed plaintiff to perform "basic" exercises in his cell. (AC ¶ 37). Plaintiff claims that defendants Miller and Smith were "deliberately indifferent" to the potential damage that plaintiff could suffer without occupational therapy. (AC ¶ 39). Plaintiff states that his left pinky finger has "atrophied" to the point that it is hypersensitive and deformed, requiring it to be wrapped at all times to prevent pain. (AC ¶ 40).

## B. Defendants' Exhibits

In support of their summary judgment motion, defendants have submitted more than 1500 pages of exhibits, including affidavits from all the defendants and plaintiff's medical records, showing the extent of the treatment and attention that plaintiff received for his injuries. (Dkt. Nos. 95, 95-1-95-15, 96, 96-1-96-7, 97, 97-1-97-9). Defendants have also filed the transcript of plaintiff's September 23, 2015 deposition. (Pl.'s Dep.) (Dkt. No. 94-3). Rather than detail all the evidence at the outset, the court will discuss the relevant information below as necessary for the court's analysis of the summary judgment motion.

## II. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a

motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## III. <u>Medical Care</u>

### A. **Legal Standards**

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia*

*Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### 1.  Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious."  *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id.*  The first question is whether the plaintiff was actually deprived of adequate medical care.  *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care."  *Id.* (citing *Farmer*, 511 U.S. at 844–47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious."  *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)).  If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious."  *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)).  However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower.  *Id.*  If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone.  *Id.* (citing *Smith*, 316 F.3d at 185).  The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as

the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

## 2. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a

9

defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

## B. Application

### 1. Objective Element

This is not a case in which plaintiff could claim that he receive "no" care for his condition. He initially claims that the care for his "jammed" finger was delayed from an unspecified date in January of 2013 until February 11, 2013, despite his "sick-call"

requests. However, the issue in this case is clearly the alleged inadequacy of the care plaintiff received together with the alleged delay in care. Defendants concede for purposes of argument that plaintiff's April 24, 2013 broken finger may be considered a "sufficiently serious" condition for purposes of the objective element. However, as stated above, when the issue is the quality of the care provided, the inquiry is narrower and focuses on the challenged delay or interruption in care, rather than on the condition alone. *See Salahuddin*, 467 F. 3d at 280; *Abreu v. Schriro*, No. 1:14-CV-6418, 2016 WL 3647958, at *3 (S.D.N.Y. July 1, 2016) (citing *Sepolvida v. Armor Corr. Svcs., Inc.*, No. 15-CV-4415, 2016 WL 1435677, at *4 (E.D.N.Y. Apr. 11, 2016)). However, the court also finds, that it does not appear, based on the evidence presented, that plaintiff's January, 2013 injury was a sufficiently serious condition.[4]

### a.      January 2013 Basketball Injury

In his amended complaint plaintiff stated that sometime in January, he "jammed" his left pinky finger playing basketball, but he was not seen by anyone in the medical department until February 11, 2013. (AC ¶ 10). As a result, plaintiff alleges that when he broke his finger on April 24, 2013, this initial injury made the subsequent injury worse.[5] At his deposition, plaintiff testified that he did not remember the date of the

---

[4] The court would also note that it does not appear that any of the defendants named in this action were aware of the initial injury. Although plaintiff states that he told corrections officers about the injury and put in sick call slips, he does not allege who was responsible for ignoring the slips or failing to call him to the medical department. In addition, as discussed below, plaintiff medical records completely contradict his claims.

[5] The amended complaint even implies that the pain from his January 2013 injury caused him to drop the barbell on his finger during the April weightlifting competition. (AC ¶ 11). However, at his deposition, plaintiff testified that he was going to squat with 700 pounds. The barbell was on a "rack."

basketball injury. (Pl.'s Dep. at 19-20). He stated that he reported the incident to a "CO," who told plaintiff that he would have to submit a "sick-call slip." (*Id.* at 19). Plaintiff stated that he told the CO when plaintiff got back to the dormitory, but he was never called to medical despite "several" sick-call slips. Plaintiff stated that he was "told" that "sometimes they just throw them away or just – they don't call you." (*Id.*) Plaintiff testified at his deposition that he was not seen by any medical provider "at all between January of 2013 . . . and when [he] injured [the pinky finger] in April of 2013." (*Id.* at 20). Plaintiff also testified that he did not play basketball again after this initial injury, and although he did lift weights, he only did "legs." (*Id.* at 20-21).

Although plaintiff testified that he did not see any medical personnel during this time, he was actually seen several times during this time period, once before February 11, 2013 and several times after that date. Defendants have filed the declaration of defendant Dr. Doreen Mary Smith, M.D., who is a physician with the Department of Corrections and Community Supervision ("DOCCS"), and who is currently the Facilities Health Service Director at Greene. Dr. Smith states that she is personally familiar with the care given to this plaintiff. (Smith Decl. ¶¶ 1-2, 7).

Plaintiff's ambulatory health record ("AHR") shows that he was examined by Dr.

---

Plaintiff "got under the rack . . . got the weight up . . . they pulled the rack away . . . I got the squat . . . , but they didn't push the rack back to me." (Pl.'s Dep. at 27). Plaintiff states that he "walked forward with this 700 pounds and  - - well, you're not supposed to do that. They were supposed to push it back to me. So, when I put the weight back down it pushed me down and I caught my finger." (*Id.*) There is no mention of "radiating pain" causing plaintiff to drop the bar on his finger.

Rosenfield[6] on January 24, 2013.[7] (Smith Decl. ¶ 11 & Ex. A – Dkt. No. 97-1 at CM/ECF p.28).[8] There is no mention of an injury to plaintiff's finger. Plaintiff was seen in February and March for various ailments. Plaintiff was examined on February 15, 19, and 21, 2013. There are also AHR entries for March 1, 14, and 20. (Dkt. No. 97-1 at 25, 26). On April 4, 15, and 18, the AHR states that plaintiff was a "no show" for sick call. (Dkt. No. 97-1 at 24, 25).

Defendant Smith points out that when plaintiff was examined during the period of time between his basketball injury and his weightlifting injury, he complained of elbow pain, knee pain, and ankle pain. (Smith Decl. ¶¶ 11-16 & Dkt. No. 97-1 at 24-28). On March 1, 2013, plaintiff complained about knee and elbow pain. (Dkt. No. 97-1 at 26). On March 14, 2013, plaintiff went to the medical department, complaining of a cold and a cut on his right "pointer finger," but did not complain of left finger pain or any previous injury. (Smith Decl. ¶ 14 & Dkt. No. 97-1 at 25). The medical provider's note states that plaintiff was lifting 800 pounds "(squat)." On March 20, 2013, plaintiff was seen by the dental department. (Dkt. No. 97-1 at 47). The treatment note states that certain teeth were "symptomatic . . . secondary to being elbowed 8 days ago playing basketball." (*Id.*) Plaintiff was not only weightlifting in between January 2013 and his

---

[6] Dr. Rosenfield is not a defendant herein.

[7] The court notes that the AHR is often difficult to read, but the entries generally clearly show the dates that plaintiff was examined by health care personnel.

[8] Although it appears some of the pages of defendants' exhibits are Bates-stamped, unfortunately, in her declaration, the defendant cites only to an exhibit, but does not cite to any specific pages of the record. When necessary to identify the document, the court will cite to the record using the docket number and the page that is assigned by the court's electronic filing system ("CM/ECF").

finger injury in April, but was also playing basketball, contrary to his deposition testimony.

Clearly if plaintiff did injure his finger playing basketball in January, the injury was not sufficiently serious to mention during seven different visits to the medical department. The fact that plaintiff continued to lift such heavy weights and play basketball belies his claim that the injury that he allegedly suffered in January was serious. *See Abreu*, 2016 WL 3647958, at *3 (one of the factors used to determine whether a condition is serious is whether the condition affects daily activities).

The evidence also shows that there was no "delay" in medical care because, contrary to his allegation, he went to the medical department seven times during the period that he states that "no one called him out" or they threw away his sick call slips. Plaintiff never mentioned any finger pain or injury notwithstanding several opportunities to do so, particularly when he was discussing pain that was related to his athletic activities.[9] Thus, any allegations that either of the facility physicians violated plaintiff's Eighth Amendment rights with respect to a January injury must be dismissed. There is no evidence that the January injury was sufficiently serious.[10]

### b. April 24, 2013 Weightlifting Injury

The court will assume for purposes of this recommendation that the crushing

---

[9] Thus, the allegation in plaintiff's complaint that "the medical department" never advised him to refrain from strenuous activity is completely unfounded. (*See* AC ¶ 11).

[10] In addition, neither Dr. Smith nor Dr. Miller could be deliberately indifferent to an injury about which they were unaware.

injury plaintiff suffered on April 24, 2013[11] was a serious injury.  Plaintiff was in a

power lifting competition, lifting 700 pounds.  When he stepped back to put the bar

back on the rack, his left pinky finger got pinched in between the bar and the rack upon

which he was putting the bar. (Pl.'s Dep. at 27-28).  The medical department was called

***immediately***, and plaintiff was taken to AMC, where he was initially treated for the

injury with a physical examination and x-rays. (Smith Decl. ¶ 19).  The x-rays showed a

subluxation of the left DIP[12] joint as well as a small avulsion fracture. *Id.*  The x-rays

also indicated that plaintiff had a subluxation of the left fifth PIP[13] joint, which seemed

to be chronic. (*Id.*)  Because plaintiff sustained a serious injury, the court will proceed

to consider the subjective element of the Eighth Amendment analysis.

### 2.   Subjective Element

#### a.   Dr. Roth

Accepting the fact that plaintiff's April 24, 2013 broken finger was sufficiently

serious, in this case, the evidence clearly shows that defendants did not act with

deliberate indifference to plaintiff's serious medical needs.  As stated above, plaintiff's

medical records span more than 1500 pages, and he ultimately had several surgeries to

correct the problems with his finger, some of which according to Dr. Roth, were of

---

[11] At his deposition, plaintiff testified that his weightlifting injury was April 23, but it is clear from the medical records that the date was April 24, 2013. (Dkt. No. 97-1 at CM/ECF p.24).

[12] DIP joint stands for Distal Interphalangeal Joint   the synovial joint between the middle and distal phalanges of the fingers. http://medical-dictionary.thefreedictionary.com/DIP+joints.

[13] PIP stands for Proximal Interphalangeal Joint, which is the joint between the proximal and intermediate digital phalanges. http://medical-dictionary.thefreedictionary.com/ proximal+ interphalangeal+joint.

plaintiff's own making. Defendants have filed Dr. Roth's declaration in addition to the medical records associated with plaintiff's post-injury care.[14]

Dr. Roth is a board-certified plastics and hand surgeon. (Roth Decl. ¶ 1). He is the Chief of the Division of Plastic Surgery at AMC. (*Id.* at 2). Attached to Dr. Roth's declaration are plaintiff's medical records from AMC (Roth Decl. Ex. A); plaintiff's medical records from Montefiore Mount Vernon Hospital ("MVH") and Dr. Richard Magill (Roth Decl. Ex. B); and plaintiff's AHR and specialty care records, including physical therapy records (Roth Decl. Ex. C).

Dr. Roth did not examine plaintiff when he was initially brought to AMC immediately after the injury. (Roth Decl. ¶ 14). However, Dr. Roth states that the plaintiff's emergency medical records show that plaintiff's finger was anesthetized, the cut on his finger was stitched, and the finger was "reduced,"[15] but is still appeared unstable. (Roth Decl. ¶ 13). The x-rays confirmed the instability. A splint was applied to the left fifth digit and a volar[16] splint was applied to immobilize the left hand. (*Id.*) Plaintiff was sent for a "post-reduction x-ray," and he was provided Lortab for pain and antibiotics. He was advised to follow up with plastic surgery within two to three days.

---

[14] Plaintiff does not allege that there was any delay in obtaining emergency care for his broken finger. His amended complaint specifically states that he was taken "immediately" to AMC. (AC ¶ 12).

[15] The closed reduction of a bone is a procedure in which the bone is set without surgery, allowing the bone to grow back together, and is most successful when performed as soon as possible after the bone breaks. https://medlineplus.gov/ency/patientinstructions/000521.htm.

[16] "Volar" is a term which means "relating to the palm of the hand or the sole of the foot; *specifically*: located on the same side as the palm of the hand. http://www.merriam-webster.com/dictionary/volar. Thus a volar split is a splint which is located on the same side as the palm of the hand.

(*Id.*)

Dr. Roth states that he first saw the plaintiff on April 29, 2012, when he also reviewed the emergency department's records from April 24, 2012. (Roth Decl. ¶ 15). After reviewing additional x-rays and examining plaintiff's finger, Dr. Roth's impression was that plaintiff had suffered a "recent open distal phalanx dorsal subluxation injury and most likely intact neruovascular structures and tendons." (Roth Decl. ¶ 17). Dr. Roth also noticed an "old flexion contracture related to a previous injury."[17] (*Id.*) However, Dr. Roth states that this previous injury "appeared to be much older than the January 2013 timeframe [sic]" when plaintiff claims that he injured his pinky finger playing basketball.[18] (*Id.*) Dr. Roth determined that plaintiff would need further treatment, so he scheduled plaintiff for surgery. (Roth Decl. ¶ 18).

The following day, Dr. Roth performed "an open reduction internal fixation of dorsal subluxation of distal phalanx of the small left finger and repaired a two centimeter laceration. (Roth Decl. ¶ 19). Dr. Roth's surgical assistant was Physician Assistant ("PA") Lindsay Schweikarth, not defendant Marc Daniels as plaintiff claims. (*Id.* & Ex. A at CM/ECF p.13) Plaintiff claims that after surgery, he was told that he "must" return in three weeks to have the pins removed because they should not remain

---

[17] A contracture is the abnormal shortening of muscle tissue, rendering the muscle resistant to stretching. http://medical-dictionary.thefreedictionary.com/flexor+contracture.

[18] Dr. Roth's report states that plaintiff told him that he had sustained a previous injury to the same finger in the region of the PIP joint "approximately 2 to 3 months prior to this injury, *which was treated elsewhere*." (Roth Decl. Ex. A at CM/ECF p.11) (emphasis added). Although this statement is consistent with plaintiff's story that he was hurt in January of 2013, it is inconsistent with plaintiff's claims that no one treated his previous injury. Plaintiff also told Dr. Roth that he had been removing the splint twice per day to wash his hands. (*Id.*)

17

in his hand for longer. (AC ¶ 13). Although plaintiff claims that he was not returned to see Dr. Roth in the appropriate time period, and the pins stayed in his hand for too long, plaintiff's statements are not accurate.

First, Dr. Roth states that he saw the plaintiff again on May 10, 2013, only ten days post-operatively.[19] (Roth Decl. ¶ 20). At that time, plaintiff was told "to return in *approximately three weeks so that removal of his pins could be considered.*" (*Id.*) (emphasis added). Dr. Roth saw plaintiff on June 14, 2013, and his pins were removed. (Roth Decl. ¶ 21 & Roth Ex. A at CM/ECF p.23). The removal of the pins occurred approximately six weeks after they were placed to immobilize the plaintiff's broken finger, not "eleven weeks" as plaintiff claims in his amended complaint. In addition, Dr. Roth states that the removal of the pins occurred "when it was medically appropriate to do so and in accordance with my plan for treatment of the plaintiff." (*Id.*)

Dr. Roth specifically opposes plaintiff's claim that any "delay" in the removal of the pins caused him harm. (Roth Decl. ¶ 22). Dr. Roth states that the pins could not be removed until healing of the subluxation occurred, and plaintiff "suffered no harm or injury by having the pins removed on June 14, 2013." (*Id.*) The court also notes that at

---

[19] Dr. Roth's progress note dated May 10, 2013 states that the plaintiff's dressing was "not as [Dr. Roth] had placed it." (Roth Ex. A at CM/ECF p.15). Plaintiff told Dr. Roth that he had been changing the dressing every other day "despite having been told not to touch it or change it." He also told Dr. Roth that he needed to remove the dressing to "wash" his finger, despite having been told to keep the finger dry. Plaintiff also complained that he was experiencing pain where the pins were "'sticking out.'" On examination, Dr. Roth noted that the pins were completely buried with no exposure. In any event, Dr. Roth replaced the splint in a manner which would avoid pressure on the area where the pins were placed. Plaintiff was again instructed not to change the splint or the dressing. Dr. Roth did note that plaintiff should be getting occupational therapy. (*Id.* & Roth Ex. A at CM/ECF p.22 Report of Consultation).

plaintiff's deposition, he first stated that he did not "recall" when the pins were removed, but then stated that he "had no reason to disagree" that the pins were removed in June. (Pl.'s Dep. at 38). Thus, any Eighth Amendment claim based on a "delay" in removing the pins must be dismissed. Plaintiff claims that Dr. Roth told plaintiff that the pins had to be removed in three weeks, but Dr. Roth and the medical records establish that, at best, the plaintiff misunderstood[20] what Dr. Roth said. Plaintiff was examined once prior to the pins' removal, and the pins were removed within a medically appropriate time. [21]

Dr. Roth also states that he examined plaintiff on July 26, 2013. (Roth Decl. ¶ 23). Plaintiff told Dr. Roth that he had been receiving hand therapy twice per week. Dr. Roth noted that plaintiff had wrapped his finger with an ace bandage, limiting his ability to regain motion in his finger. Dr. Roth advised plaintiff to stop wrapping the finger and continue with his hand therapy. (*Id.* & Ex. A at CM/ECF p.17, 23) Dr. Roth saw plaintiff on August 30, 2013, and it was decided that a "capsulectomy" of the left small finger PIP joint would need to be done to improve on the contracture. (Roth Decl.

---

[20] It is clear from plaintiff's deposition that he was speculating about most of the statements that he made regarding doctors' orders. Plaintiff also stated that he was supposed to see Dr. Roth three weeks after surgery, but someone in Dr. Roth's office called Greene to let the officials know that Dr. Roth was "on vacation," so plaintiff was not seen until "the next month." (Pl.'s Dep. at 36). Plaintiff then stated "[s]o I guess ten weeks went by . . . I think, or something like that." (*Id.*)

[21] The court also notes that, at plaintiff's deposition, he was asked how he knew when the pins were supposed to be removed, and he stated that he asked another doctor    Dr. Magill. (Pl.'s Dep. at 37). According to plaintiff, Dr. Magill told him that pins were only supposed to stay in from three to six weeks. (*Id.*) Now, it is clear that the pins were actually removed within six weeks. Thus, even plaintiff's own information is consistent with Dr. Roth's declaration and supports summary judgment for defendants.

¶ 24).  Dr. Roth performed the surgery on October 22, 2013 with Dr. Mark Daniels assisting.[22] (Roth Decl. ¶ 25).  After surgery, plaintiff was provided pain medication and antibiotics. (Roth Decl. ¶ 26).

Dr. Roth states that, unfortunately, crush injuries to a pinky finger, such as the one suffered by plaintiff "often result in decreased range of motion in the finger even with good and proper medical care." (Roth Decl. ¶ 28).  According to Dr. Roth, it is not unusual for these injuries to require multiple surgeries to attempt to increase the range of motion. (*Id.*)  In addition, the plaintiff's April 24, 2013 x-rays showed that a previous injury to the finger contributed to his decreased range of motion. (*Id.*)

Dr. Roth states that on or about April 21, 2014, plaintiff told Dr. Roth that he wanted additional surgery on his finger. (Roth Decl. ¶ 32).  When Dr. Roth told plaintiff that arthroplasty[23] was not a "good option for him," he asked for a "second

---

[22] Dr. Roth's notes regarding the October 22, 2013 surgery state that plaintiff had previously undergone surgery for the DIP joint due to the April 2013 injury, but that plaintiff also had a contracture of the PIP joint that he told Dr. Roth that he sustained in January of 2013, but was not treated. (Ex. A at CM/ECF p.58).  The doctor also stated that although plaintiff "requested" surgery on both the DIP and PIP joints in October, the October surgery was only to improve the function of the PIP joint "for a separate injury which had not been treated." (*Id.*)  Thus, plaintiff's allegation that Dr. Roth "misled" him into believing that the second surgery was "related" to the April injury is meritless. Clearly, plaintiff and Dr. Roth had a discussion about the purpose of the second surgery and about the various treatment options. (*Id.* at 59).  To the extent that plaintiff would claim that his statement to Dr. Roth shows that he did not receive proper care for his January injury (assuming that one occurred in January), it is clear from the facility medical records that plaintiff never complained about any injury in January and continued to engage in athletic activities (including basketball) notwithstanding his alleged injury.

[23] "Arthroplasty is surgery to relieve pain and restore range of motion by realigning or reconstructing a joint." http://medical-dictionary.thefreedictionary.com/arthroplasty.

opinion," and Dr. Roth referred him to Dr. Magill.[24] (*Id.* & Ex. A at CM/ECF p.19)

On March 11, 2015, plaintiff had a left small PIP contracture release capsulectomy, osteotomy at the base of the middle phalanx of his left small finger. (Roth Decl. ¶ 29 & Ex. B at CM/ECF pp.1-51, 50-51 (Dkt. No. 96-2)). There was a large volar overgrowth which caused the limitation on flexion. Plaintiff underwent another surgical procedure on August 26, 2015 to release additional contractures. (*Id.*) A fusion was recommended, but plaintiff opted for a different procedure to correct "ongoing deformities in the plaintiff's pinky finger which occurred as a result of the traumatic crush injury." The March 11, 2015 and August 26, 2015 surgeries were performed by Dr. Magill at MVH.[25] (*Id.* & Ex. B at CM/ECF pp.52-60, Ex. B-1 at CM/ECF pp.1-63, 64-65 (Dkt. No. 96-3)). Dr. Roth states that any alleged decrease in plaintiff's range of motion was a "natural result" of his injury and not caused by any medical treatment provided by the defendants. (Roth Decl. ¶ 30).

Any disagreement that plaintiff has with Dr. Roth's medical decisions cannot be the basis for an Eighth Amendment claim.[26] *See Simpson v. Oakes*, No. 15-635-pr, 2016

---

[24] Dr. Roth's April 4, 2014 consultation report states "*I recommend 2nd opinion with another orthopedic hand surgeon." (Roth Decl. Ex A at CM/ECF p.19).

[25] Plaintiff makes no claims against Dr. Magill.

[26] In Dr. Magill's post-operative report from the August 26, 2015 surgery, he noted the background of plaintiff's injury and stated that plaintiff "wanted to do something to improve his DIP motion." (Roth Decl. Ex. B-1 at CM/ECF pp.64-65). Dr. Magill suggested a fusion, but plaintiff wanted "something in lieu of a fusion," and "after discussing options," plaintiff elected a "takedown of his ankylosis and interpositional arthroplasty." (Id.) Clearly, plaintiff has been given a great deal of medical care, including a second opinion and additional surgeries. There are always differing opinions on the pros and cons of a particular procedure. Although plaintiff is not entitled to the care of his choice, in this instance, plaintiff was afforded the care that he desired.

WL 791088, at *1 (2d Cir. March 1, 2016) (citing *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1988); *Hernandez v. Keane*, 341 F.3d 137, 149 (2d Cir. 2003)). In *Simpson*, the court found that "[a]gainst defendants' detailed declarations and Simpson's own voluminous medical records, Simpson identifies *no* evidence of deliberate indifference giving rise to a genuine issue of material fact to be decided at trial." *Id.* "[E]ven a pro se litigant cannot defeat a motion for summary judgment through mere allegations or conclusory statements unsupported by facts." *Id.* (citing *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). Plaintiff's claims against Dr. Roth should be dismissed.

### b.    Dr. Daniels

With respect to Dr. Daniels, plaintiff is incorrect about the procedure in which he participated. Dr. Daniels did not become involved with plaintiff's care until he assisted Dr. Roth in October of 2013. Thus, he could not have "disregarded" any alleged responsibility for the removal of plaintiff's pins after the April 2013 surgery, even it the removal had been delayed, which as this court discussed above, it was not. He was not "deliberately indifferent" to plaintiff's follow-up care. There are no further claims against Dr. Daniels. Thus, any claims against Dr. Daniels should be dismissed.

### c.    Dr. Smith, Dr. Miller,[27] and PT Abenes

Plaintiff claims that Dr. Smith and Dr. Miller "disregarded" their responsibilities

---

[27] As stated above, any claims as against these two facility doctors regarding the January injury should be dismissed based upon the lack of a sufficiently serious injury. This section addresses plaintiff's claims of deliberate indifference against Drs. Smith and Miller as to plaintiff's allegations that they disregarded or delayed implementing Dr. Roth's orders.

to make sure that plaintiff's pins were removed in a timely manner. As stated above with respect to Dr. Roth, it is clear that plaintiff's pins were removed when it was medically indicated. Thus, plaintiff has raised no question of fact, and no reasonable jury could conclude that these allegations support a claim of deliberate indifference by Drs. Smith and Miller. Plaintiff also alleges that defendants Smith and Miller "deviated from normal medical standards"[28] when they failed to "follow-up" on Dr. Roth's order for occupational therapy and then ignored plaintiff's complaints about the extreme pain he was suffering. (AC ¶ 24).

Once again, the medical records belie plaintiff's allegations, even though it is true that plaintiff initially received physical therapy, not occupational therapy for his finger. Defendants have submitted the declaration of defendant Physical Therapist ("PT") Nelson Abenes, together with Exhibits A-A-3. (Abenes Decl.) (Dkt. No. 95-95-3). PT Abenes states that he is under contract to provide physical therapy services for DOCCS. (Abenes Decl. ¶ 2). When an inmate requires hand therapy, he is referred by one of the physicians in the inmates correctional facility. (Abenes Decl. ¶ 10). PT Abenes first saw plaintiff on July 1, 2013. (Abenes Decl. ¶ 11). Plaintiff attended therapy sessions, including aggressive assisted and passive range of motion therapy twice per week until August 9, 2013. (Abenes Decl. ¶ 12). Plaintiff received additional referrals on October 4 and 25, 2013, and he continued getting therapy until approximately January 6, 2014. (*Id.*)

---

[28] To the extent that this allegation sounds in negligence or malpractice, it is insufficient to state a claim under section 1983. *See Sonds*, 151 F. Supp. 2d at 312.

Plaintiff did receive an Occupational Therapy ("OT") consultation on January 10, 2014 at AMC. (Abenes Decl. ¶ 13). At his OT consultation, plaintiff was instructed in self-range of motion ("ROM") exercises. However, plaintiff reported that he had been doing the exercises all along. (Abenes Decl. ¶ 14). He also told the OT that therapy was "not going to straighten my finger. I need surgery." (Abenes Decl. ¶ 15). Plaintiff's AHR contains a notation that the OT felt that plaintiff did not have "further indication for OT. (Abenes Decl. Ex. A at CM/ECF p.23). PT Abenes states that, based on his "training, education, and review of the medical records, . . . the plaintiff suffered no injury with respect to being placed in PT as opposed to OT. (Abenes Decl. ¶ 17).

Defendant Abenes states that an OT assists people in their abilities to perform the daily tasks of living and self care, while a PT tends to be more focused on "evaluating and diagnosing movement dysfunction and treating injuries." (Abenes Decl. ¶ 20). A PT will be more adept at treating the physical source of the injury. Plaintiff reported that he was independent in his daily activities and self care, thus, a PT would be more appropriate in his case.[29] In any event, here is "a great deal of crossover between OT and PT." (*Id.*) PT Abenes states that he is familiar with OT education, training, and capabilities. PT Abenes states that the exercises that would have been used with plaintiff for his finger injury would have been the same with either PT or OT.[30] (Abenes

---

[29] The December 24, 2013 notation in plaintiff's AHR states that the OT consult was "denied in favor of PTH." (Abenes Decl. Ex. A at 32).

[30] Although Dr. Roth's January 30, 2014 consultation report states that he recommended Occupational Therapy to help increase plaintiff's range of motion, (Roth Decl. Ex. A at CM/ECF p.20), Dr. Roth recommended active range of motion exercises, passive range of motion exercises, and "whatever" modalities will help increase active flexion and possible stimulate the joint. These were

Decl. ¶ 21). The court notes that on November 8, 2013, Dr. Roth stated that plaintiff

was "getting PT today it [sic] on his own." (Abenes Ex. A-2) (Dkt. No. 95-2 at 5). Dr.

Roth also stated that plaintiff had "a significant improvement of extension and flexion."

(*Id.*) Dr. Roth recommended continuing hand therapy and told plaintiff he could

resume "full unrestricted duties from plastic surgery/hand surgery point of view." (*Id.*)

Dr. Miller points out that, after Dr. Magill's March 2015 surgery, Dr. Magill stated "Pt

to start hand therapy next week . . . aggressive therapy for PIP flexion." (Miller Decl.

Ex. C-1 at CM/ECF p.8) (Dkt. No. 95-15). There is no distinction in Dr. Magill's

recommendation between OT and PT. As stated above, plaintiff's disagreement with

the type of therapy provided for his hand is not the basis for an Eighth Amendment

claim,[31] and plaintiff raises no question of fact regarding the alleged deliberate

indifference of defendants Smith, Miller, or Abenes.[32]

      **WHEREFORE**, based on the findings above, it is

      **RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No.

94) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**.

---

the same exercises that plaintiff was doing with PT Abenes. Dr. Roth stated that he would "reassess" in three months. (*Id.*)

[31] There are many notations in plaintiff's AHR that he was taken for physical therapy. (Abenes Decl. Ex. A at 23, 32, 36, 39, 40, 41 & Dkt. No. 95-1 at 11, 12, 14, 15).

[32] In his response to defendants' motion for summary judgment, plaintiff states that he does **not** claim that he was injured as a result of defendant Abenes providing physical therapy as opposed to occupational therapy. (Dkt. No. 104-2). If that is the case, then neither Dr. Smith, nor Dr. Miller, to the extent that they sent plaintiff to defendant Abenes, rather than the OT allegedly ordered by Dr. Roth, were deliberately indifferent to plaintiff's serious medical needs. As plaintiff states that his "would constitute the type of dysfunction of movement that [Abenes] would be trained to treat." (*Id.*) (citing Abenes Decl. ¶ 20).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 26, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge